UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LISA MILLIGAN,

      Plaintiff,                                                Hon. Robert J. Jonker

v.                                                            Case No. 1:11-CV-642

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.
_____/

## REPORT AND RECOMMENDATION

        This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits under Titles II and XVI of the Social Security Act.  Section 405(g) limits the Court to a review of the administrative record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive.  Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of social security appeals, the undersigned recommends that the Commissioner's decision be **affirmed**.

## STANDARD OF REVIEW

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This

standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 20 years of age on her alleged disability onset date and 25 years of age on the date of the ALJ's decision. (Tr. 11, 19, 115). Plaintiff possesses a General Equivalency Diploma (GED), has attended college, and worked previously as a fast food worker. (Tr. 17, 29-30). Plaintiff also worked previously, and continued to work through the date of the ALJ's decision, as a strip club dancer. (Tr. 29-30).

Plaintiff applied for benefits on June 21, 2007, alleging that she had been disabled since January 1, 1997, due to emotional impairments. (Tr. 11, 115-22). Plaintiff later amended her disability onset date to January 1, 2005. (Tr. 11). Plaintiff's applications were denied, after which time she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 70-114). On November 6, 2009, Plaintiff appeared before ALJ Timothy Stueve, with testimony being offered by Plaintiff and vocational expert, Paul Delmar. (Tr. 24-69). In a written decision dated December 4, 2009, the ALJ determined that Plaintiff was not disabled. (Tr. 11-19). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 1-4). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

Plaintiff's insured status expired on June 30, 2005. (Tr. 13). Accordingly, to be eligible for Disability Insurance Benefits under Title II of the Social Security Act, Plaintiff must

establish that she became disabled prior to the expiration of her insured status. *See* 42 U.S.C. § 423; *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

## **RELEVANT MEDICAL HISTORY**

On June 3, 2002, Plaintiff was examined by Dr. Vicente Pacheco, a child and adolescent psychologist. (Tr. 265). Plaintiff reported that she was taking her medication "consistently." (Tr. 265). Plaintiff's mother reported that she was "pleased with [Plaintiff's] response to the medication in that her mood has been more stable and they are communicating better." (Tr. 265). Plaintiff "denied any problems with medications," but "was also guarded when asked about the use of substances and would not respond when [the doctor] pointed out that [her] mother can tell when she has come home high on pot." (Tr. 265).

On July 15, 2002, Plaintiff was examined by Dr. Pacheco. (Tr. 261-62). When confronted with evidence that she had failed a recent drug screen, Plaintiff acknowledged that she was "using drugs to take care of her anxiety." (Tr. 261). Plaintiff also "insisted that she is now 18 and she can do what she pleases." (Tr.261). Plaintiff's medication regimen was modified. (Tr. 261). On August 26, 2002, Plaintiff reported to Dr. Pacheco that since being placed on probation earlier that month she has stopped using drugs and "is more alert during the daytime." (Tr. 257).

On October 2, 2002, Plaintiff was examined by Dr. Pacheco. (Tr. 256). Plaintiff reported that she was taking her medications "without any difficulties." (Tr. 256). The doctor observed that Plaintiff's mood was "bright" and that she was "smiling" and "alert." (Tr. 256). Plaintiff also exhibited a "more positive attitude about life" and "spoke [at] length about her good experience in her workplace." (Tr. 256). Treatment notes dated December 2, 2002, however,

4

indicate that Plaintiff was recently "involved in a drunk driving accident and violated her probation." (Tr. 254). When asked about this incident by Dr. Pacheco, Plaintiff responded that "she is 18 [and] she can do whatever she pleases." (Tr. 254-55).

On January 6, 2003, Plaintiff was examined by Dr. Pacheco. (Tr. 253). Plaintiff's mother reported that Plaintiff was participating in "intensive probation and getting regular drug screens" which revealed that Plaintiff was not presently using drugs. (Tr. 253). The doctor observed that Plaintiff's mood "was bright and she was more stable and responsive." (Tr. 253). Plaintiff "denied any difficulties with her current medications and she is particularly happy that her anxiety level has gone down and she is sleeping better at night." (Tr. 253). Plaintiff's mother also reported that Plaintiff's "moods are also more stable." (Tr. 253). Treatment notes dated March 10, 2003, indicate that Plaintiff was not using drugs and that "her anxiety is better and her sleep has also improved." (Tr. 252). Treatment notes dated August 18, 2003, indicate that Plaintiff "continues to do well on her medications" and "presented as a pleasant and responsive young lady whose mood was bright." (Tr. 250).

Treatment notes dated October 20, 2003, indicate that Plaintiff's "moods have been stable" and she was presently attending college. (Tr. 248). Treatment notes dated December 3, 2003, indicate that aside from experiencing anxiety about upcoming exams, Plaintiff's moods "have been stable." (Tr. 246). Treatment notes dated January 28, 2004, indicate that Plaintiff was "pleasant and responsive." (Tr. 242). Plaintiff reported that she attends college "four days a week and feels good about her schooling." (Tr. 242). Treatment notes dated April 14, 2004, indicate that Plaintiff was taking her medication "consistently" and that her moods were "stable." (Tr. 240).

5

On August 16, 2004, Plaintiff was examined by Dr. Pacheco. (Tr. 238-39). Plaintiff reported that "her moods have been stable" and that she would be attending college full time beginning later that month. (Tr. 238). Plaintiff also reported that she was "doing well" and "making lots of money" working "at a strip club." (Tr. 238). On October 27, 2004, Plaintiff reported to Dr. Pacheco that "her moods are stable on her current medication, and she is doing well academically." (Tr. 236).

On January 31, 2005, Plaintiff reported to Dr. Pacheco that she was taking her medications "consistently" and continuing to attend college and work at a strip club. (Tr. 232). On March 30, 2005, Plaintiff was examined by Dr. Pacheco. (Tr. 230-31). The doctor observed that Plaintiff "was pleasant and in a good mood." (Tr. 230). Plaintiff reported that "her moods are stable" and that she attends school two days a week and works at the strip club four days a week. (Tr. 230). On June 8, 2005, Plaintiff reported to Dr. Pacheco that she was "doing well at work and in school." (Tr. 229).

On September 26, 2005, Plaintiff was examined by Dr. Pacheco. (Tr. 228). Plaintiff "presented with a bright mood and was pleasant and responsive." (Tr. 228). Plaintiff reported that "she had a good summer" and was attending college part time and working full time. (Tr. 228). Plaintiff reported that her "health is good." (Tr. 228). Plaintiff's mother "concurred that [Plaintiff] is doing very well" and that her "moods are stable." (Tr. 228) Treatment notes dated December 5, 2005, indicate that Plaintiff "is taking her medications without any difficulties" and continues to work full time and attend college part time. (Tr. 227).

On January 9, 2006, Plaintiff reported to Dr. Pacheco that she "is taking her medications daily and feels her moods are stable." (Tr. 226). Plaintiff reported that she was

6

presently working and would be resuming college in March. (Tr. 226). On February 6, 2006, Plaintiff reported to Dr. Pacheco that her medications are "helpful and that her moods are stable" and that she "continues to work." (Tr. 225). On April 3, 2006, Plaintiff reported to Dr. Pacheco that she had recently returned to college part time and that her "moods are stable." (Tr. 224). Plaintiff "also explained that she stopped drinking anything caffeinated and has been drinking lots of water and she is doing better overall." (Tr. 224). On August 9, 2006, Plaintiff reported to Dr. Pacheco that "her health is good and her moods are stable." (Tr. 222). On October 16, 2006, Plaintiff reported to Dr. Pacheco that "her moods are stable." (Tr. 221). Plaintiff also reported that she attends college one day a week and "works the other days." (Tr. 221).

On December 20, 2006, Plaintiff was examined by Dr. Pacheco. (Tr. 220). Plaintiff reported that she discontinued taking Paxil "because of decreased libido but now she is more anxious, particularly with going to work." (Tr. 220). Plaintiff reported that she was "having a difficult time dealing with" her job, but "has done better, however, outside of work." (Tr. 220). Plaintiff's medication regimen was modified. (Tr. 220). On February 21, 2007, Plaintiff reported to Dr. Pacheco that "her mood is stable and she is functioning well both at home and in school and at work." (Tr. 219)

On May 2, 2007, Plaintiff was examined by Dr. Pacheco. (Tr. 218). The doctor observed that Plaintiff "was pleasant and in a bright mood." (Tr. 218). Plaintiff reported that she "continues to take her medications and feels her moods are stable." (Tr. 218). Plaintiff also reported that she was presently "taking judo for recreation." (Tr. 218). On August 6, 2007, Plaintiff was examined by Dr. Pacheco. (Tr. 382). Plaintiff reported that "she has been taking her medications

daily without any problems" and that "her moods have been stable." (Tr. 382). The doctor observed that Plaintiff was "pleasant with a bright mood." (Tr. 382).

On September 7, 2007, Plaintiff participated in a consultive examination conducted by Joseph Bechard, Ed.S. (Tr. 341-44). Plaintiff reported that she was disabled because she has "very bad anxiety, social anxiety, I don't like to be around people." (Tr. 341). Plaintiff also reported that when she does not take her medication she experiences mood swings and hallucinations. (Tr. 341). Plaintiff reported that "for the most part I don't go out, I'm too nervous in groups," but acknowledged working as a dancer in a strip club. (Tr. 342). Plaintiff also reported that, "when I am depressed it's a (9-10), if I get bad it's bad - the last time a month ago. My anxiety is a (10), my angry (10). When I get angry I get angry." (Tr. 343). Plaintiff also reported "having had panic attacks but not since she has been on her medications." (Tr. 343). Plaintiff was diagnosed with: (1) bipolar disorder, severe with psychotic features; (2) generalized anxiety disorder; and (3) cannabis-related disorder. (Tr. 344). Plaintiff's GAF score was rated as 50-55. (Tr. 344).

On September 14, 2007, Dr. John Pai completed a Psychiatric Review Technique form regarding Plaintiff's mental limitations. (Tr. 351-64). Determining that Plaintiff suffered from bi-polar disorder, generalized anxiety disorder, borderline personality disorder, and a cannabis-related disorder, the doctor concluded that Plaintiff satisfied the Part A criteria for Sections 12.04 (Affective Disorders), 12.06 (Anxiety-Related Disorders), 12.08 (Personality Disorders), and 12.09 (Substance Addiction Disorders) of the Listing of Impairments. (Tr. 352-60). The doctor determined, however, that Plaintiff failed to satisfy any of the Part B criteria for these particular Listings. (Tr. 361). Specifically, the doctor concluded that Plaintiff experienced mild restrictions in the activities of daily living, moderate difficulties in maintaining social functioning, mild

8

difficulties in maintaining concentration, persistence or pace, and never experienced episodes of deterioration or decompensation in work or work-like settings. (Tr. 361).

Dr. Pai also completed a Mental Residual Functional Capacity Assessment form regarding Plaintiff's limitations in 20 separate categories encompassing (1) understanding and memory, (2) sustained concentration and persistence, (3) social interaction, and (4) adaptation. (Tr. 347-49). Plaintiff's abilities were characterized as "moderately limited" in five categories. (Tr. 347-48). With respect to the remaining 15 categories, however, the doctor reported that Plaintiff was "not significantly limited." (Tr. 347-48).

On September 24, 2007, Plaintiff was examined by Dr. Pacheco. (Tr. 380-81). Plaintiff's mother reported that Plaintiff was experiencing "stressors at work where she dances and with her boyfriend who is described as controlling." (Tr. 380). Plaintiff, however, "minimize[d] both issues and insisted that she was more stressed in the past and that currently she is not as stressed as previously and her medications are helping." (Tr. 380). On November 12, 2007, Plaintiff reported to Dr. Pacheco that "she continues to take her medications daily and her moods are stable." (Tr. 379). Plaintiff also reported that she attends school one day a week, "but works part time as a stripper and would like to get out of this because of the stress involved." (Tr. 379). On January 7, 2008, Plaintiff reported to Dr. Pacheco that she was taking her medication daily and that her moods were "stable." (Tr. 378). Plaintiff also reported that "her supervisor at work has been very hard on [her] and other co-workers have been threatened." (Tr. 378). As a result, Plaintiff reported that she "applied for another job in Kalamazoo." (Tr. 378).

On February 25, 2008, Plaintiff was examined by Dr. Pacheco. (Tr. 377). Plaintiff reported that she recently started working "three days a week" at a different strip club. (Tr. 29-30,

377). Plaintiff reported that "the working environment is much better and she is happier in her day-to-day work." (Tr. 377). Plaintiff reported that she continues to take her medications daily and that her "moods are stable." (Tr. 377). On April 14, 2008, Plaintiff reported to Dr. Pacheco that she was attending college one day a week and working three days a week. (Tr. 376). Plaintiff reported that she was "doing better overall and takes her medications daily." (Tr. 376). Treatment notes dated June 2, 2008, indicate that Plaintiff's "moods are stable and she is doing well." (Tr. 375). On August 25, 2008, Plaintiff reported to Dr. Pacheco that her moods were "stable." (Tr. 374). On October 27, 2008, Plaintiff reported to Dr. Pacheco that her moods were "stable." (Tr. 373). On December 15, 2008, Plaintiff reported to Dr. Pacheco that "her moods are stable and she takes her medications daily." (Tr. 372). Treatment notes dated May 4, 2009, indicate that Plaintiff's moods were "stable." (Tr. 369).

On June 4, 2009, Plaintiff was examined by Dr. Pacheco. (Tr. 366-67). Plaintiff reported that she was experiencing anxiety due to the relationship with her boyfriend. (Tr. 366). Plaintiff reported that her boyfriend "does not want her to continue with her line of work, which is her dancing, as the boyfriend apparently is jealous." (Tr. 366). Plaintiff reported that her boyfriend "apparently is suspicious and has been checking on her." (Tr. 366). Plaintiff acknowledged that "she is also suspicious that [her] boyfriend is cheating but denied being suspicious of anybody else." (Tr. 366). The doctor observed that "there are no indications of any psychotic process." (Tr. 366). Plaintiff reported that she "is taking her medications daily." (Tr. 366). On August 17, 2009, Plaintiff reported to Dr. Pacheco that "her moods are stable and she is taking her medications daily." (Tr. 365). Plaintiff also reported that she was "back with her boyfriend." (Tr. 365). Plaintiff's mother

reported that the relationship between Plaintiff and her boyfriend "is up and down but nothing serious like two months ago." (Tr. 365).

## ANALYSIS OF THE ALJ'S DECISION

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[1]  If the Commissioner can make a dispositive finding at any point in the review, no further finding is required. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining her residual functional capacity. *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528. While the burden of proof shifts

---

[1] 1.  An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2.  An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3.  If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4.  If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5.  If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

to the Commissioner at step five of the sequential evaluation process, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

The ALJ determined that Plaintiff suffered from: (1) bi-polar disorder, (2) general anxiety disorder, (3) borderline personality disorder, and (4) cannabis related disorder, severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1. (Tr. 13-15).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform a full range of work at all exertional levels subject to the following nonexertional limitations: (1) only simple, routine and repetitive tasks in a work environment free of fast paced production requirements, (2) only simple work-related decisions with few, if any, work place changes, (3) she is able to understand, carry out and remember simple instructions, respond appropriately to supervisors, co-workers, and usual work situations, and deal with changes in a routine work setting on a sustained basis, (4) no interaction with the public, but only isolated work with occasional supervision, and (5) she can be around co-workers but with only occasional interaction. (Tr. 15).

The ALJ determined that Plaintiff could not perform her past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, her

limitations notwithstanding. *See Richardson*, 735 F.2d at 964. While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert Paul Delmar.

The vocational expert testified that there existed approximately 44,500 jobs in the state of Michigan which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 60-61). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988); *Martin v. Commissioner of Social Security*, 170 Fed. Appx. 369, 374 (6th Cir., Mar. 1, 2006). The ALJ concluded, therefore, that Plaintiff was not entitled to benefits.

a. The ALJ Properly Evaluated the Medical Evidence

Plaintiff asserts a single claim on appeal, that the ALJ erred by failing to afford controlling weight to the opinion expressed by her counselor Cynthia Gerish. The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and her maladies generally possess significant insight into her medical condition. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). An ALJ must, therefore, "give the opinion of a treating source

13

controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in [the] case record.'" *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)). The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must "give good reasons" for doing so. *Wilson*, 378 F.3d at 544. In articulating such reasons, the ALJ must consider the following factors: (1) length of the treatment relationship and frequency of the examination, (2) nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, (5) the specialization of the treating source, and (6) other relevant factors. *See* 20 C.F.R. §§ 404.1527, 416.927; *see also*, *Wilson*, 378 F.3d at 544. The ALJ is not required, however, to explicitly discuss each of these factors. *See, e.g., Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 Fed. Appx. 448, 450 (5th Cir., Jan. 19, 2007). Instead, the record must reflect that the ALJ considered those factors relevant to her assessment. *See Oldham*, 509 F.3d at 1258; *Undheim*, 214 Fed. Appx. at 450.

14

Plaintiff asserts that the ALJ was obligated to afford controlling weight to the responses Gerrish provided on a November 4, 2009 form report. (Tr. 463-65). Gerrish reported that Plaintiff experienced "marked limitations"[2] in the following areas of functioning: (1) deal with the public; (2) deal with work stresses; (3) behave in an emotionally stable manner; and (4) relate predictably in social situations. (Tr. 463-64). Gerrish reported that Plaintiff experienced "marked limitations" in maintaining social functioning and experienced "severe mood fluctuations, paranoia, [and] visual hallucinations." (Tr. 464).

Gerrish reported that Plaintiff experienced "moderate limitations"[3] in the following areas of functioning: (1) relate to co-workers; (2) interact with supervisors; (3) use judgment; (4) function independently; and (5) maintain attention/concentration. (Tr. 463). Gerrish reported that Plaintiff experienced "mild limitations"[4] in the following areas of functioning: (1) ability to understand, remember, and carry out complex job instructions and detailed but not complex job instructions; and (2) demonstrate reliability. (Tr. 463-64). Gerrish also reported that Plaintiff experienced "mild limitations" in activities of daily living and maintaining concentration, persistence, or pace. (Tr. 464). Gerrish noted that Plaintiff experienced "no limitations" in the following areas of functioning: (1) follow work rules; and (2) maintain personal appearance. (Tr. 463-64). Gerrish concluded that:

---

[2] The form that Gerrish completed defined "marked limitations" as "limitations that seriously, but not completely, interfere with the ability to function independently, appropriately and effectively on a sustained basis. (Tr. 463).

[3] The form that Gerrish completed defined "moderate limitations" as "limitations that result in satisfactory but limited function." (Tr. 463).

[4] The form that Gerrish completed defined "mild limitations" as "limitations that do not significantly limit a person's ability to perform most jobs." (Tr. 463).

15

> One of [Plaintiff's] major hurdles to adequate functioning has been fluctuation and inconsistency. She has severe levels of fluctuation of her mood and her paranoia. Some days she does quite well, but other days she does poorly. Because of the inconsistency in her mood, she has inconsistency in her ability to function on a daily basis. On a bad day she has difficulty focusing and accomplishing tasks. On a really bad day she is practically unable to leave her home. On average her bad days exceed once per week.

(Tr. 465).

It must first be noted, that Gerrish did not articulate *any* specific functional limitations for Plaintiff. Instead, Gerrish simply completed a prepared form that employs imprecise and subjective terms. The Court does not doubt that Plaintiff experiences limitations in certain areas of functioning, but the assertion that Plaintiff experiences "marked" or "moderate" or "mild" limitations in a given area of functioning simply does not translate to specific functional limitations. While the Court recognizes that the form in question "defines" the terms in question, those definitions are likewise imprecise and subjective. Nevertheless, the ALJ, with a single exception, incorporated in his RFC determination the limitations identified by Gerrish.

Gerrish reported that Plaintiff experienced "marked limitations" in her ability to deal with the public. The ALJ limited Plaintiff to work that involved "no interaction with the public." Gerrish reported that Plaintiff experienced "marked limitations" dealing with work stresses. The ALJ limited Plaintiff to simple, routine work in an environment with few, if any, work place changes and free of fast-paced production requirements. Gerrish reported that Plaintiff experienced "marked limitations" in her ability to behave in an emotionally stable manner and relate predictably in social situations. First, this particular opinion is not supported by the evidence of record, most notably the long term observations of Dr. Pacheco, a child and adolescent psychologist. The evidence instead

reveals that when Plaintiff takes her prescribed medication as directed and does not abuse alcohol or illegal drugs, she functions at a much higher level than asserted by Gerrish. Nonetheless, the ALJ limited Plaintiff to simple and routine work with minimal work stresses and, furthermore, limited her to isolated work with only occasional supervision or interaction with co-workers. In short, the ALJ recognized these particular aspects of Gerrish's opinion and amply accounted for such in his RFC determination. As for those areas of functioning in which Gerish reported Plaintiff experienced moderate or mild limitations, such are sufficiently accounted for in the ALJ's RFC determination.

The one aspect of Gerrish's assessment with which the ALJ disagreed, however, was the assertion that Plaintiff experienced "marked limitations" in maintaining social functioning. In support of his decision to reject this aspect of Gerrish's opinion, the ALJ observed that Plaintiff was able to maintain a long-term relationship with her boyfriend, handle a stressful job as a strip club dancer, and intermittently attend college. (Tr. 17). The ALJ concluded, therefore, that such constituted "sufficient evidence to support only a moderate limitation in social function." (Tr. 17). Consistent with this particular determination, the ALJ limited Plaintiff to work with no interaction with the public and only occasional interaction with supervisors or co-workers.

In sum, the ALJ's RFC determination, with one exception, incorporates or is consistent with the limitations articulated in Gerrish's November 4, 2009 report. As for the single aspect of Gerrish's assessment with which the ALJ disagreed, his rationale for discounting such is supported by substantial evidence. Accordingly, Plaintiff's argument is rejected.

## **CONCLUSION**

For the reasons articulated herein, the undersigned concludes that the ALJ's decision adheres to the proper legal standards and is supported by substantial evidence. Accordingly, it is recommended that the Commissioner's decision be **affirmed**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within fourteen (14) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within such time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date: July 30, 2012                                              /s/ Ellen S. Carmody
                                                                                ELLEN S. CARMODY
                                                                                United States Magistrate Judge